## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF VIRGINIA
### Norfolk Division

LIANE TRUELL,

> Plaintiff,

> v.                                                        CIVIL ACTION NO. 2:04cv716

REGENT UNIVERSITY SCHOOL OF LAW

> Defendant.

### *MEMORANDUM OPINION & ORDER*

Before the Court is the Motion of Regent University Law School ("Defendant") to

Dismiss, or in the Alternative, for Summary Judgment.  Specifically, Defendant contends that

Plaintiff has failed to state a claim upon which relief may be granted.  The Court has considered

the memoranda of the parties and these matters are now ripe for decision.  For the reasons set forth

below, Defendant's Motion to Dismiss is **DENIED**.

### I.  FACTS AND PROCEDURAL HISTORY

For the purposes of this motion to dismiss, the Court assumes the following facts to be

true.  Liane Truell ("Plaintiff") is currently a resident of Georgia.  Regent University Law School

is located in Virginia Beach, Virginia.  Defendant maintains a Law School Policies and

Procedures Manual ("Manual") and University Student Handbook ("Handbook").  The Manual

states that:

> At the end of every academic semester, each student will be given the
> opportunity to give his or her evaluation of a course.  Students are asked to
> evaluate (and may do so anonymously) the appropriateness of the reading
> materials assigned, the adequacy of the class coverage in light of the syllabus, the
> teacher's knowledge of the subject matter, the teacher's ability to communicate

that knowledge effectively, and the spiritual content of the course.
    Student evaluations are reviewed by the instructors only after course grades
have been assigned.  Student evaluations are also reviewed by the Dean.

Regent Univ. Law Sch. Policies & Procedures Manual at 41 (2001).

Plaintiff began her career as a student at Regent University Law School in the fall of

2001.  In late November 2001, Plaintiff completed three course evaluation forms for Civil

Procedure, Property, and Torts.  The evaluation forms encouraged students to write comments

that would be "helpful and appropriate regarding the instructor's strengths and weaknesses in

teaching performance" on the back of the forms.  Although all three courses were taught by

different professors, Plaintiff wrote three very similar accounts of sexual harassment and racial

discrimination.  The accounts can be fairly described as false, offensive, malicious, and

delusional.

Some time after the evaluations were completed, the dean of the law school, Jeffrey

Brauch ("Brauch"), called Plaintiff to a meeting with himself, the Vice President for Student

Affairs, Michael Ash ("Ash"), and the Assistant Dean for Student Affairs, Rebekah Woods

("Woods").  During this meeting, Brauch raised the question of the authorship of the evaluations.

Plaintiff left the meeting upon being confronted about her role in the matter.

On November 30, 2001, Brauch notified Plaintiff by letter that she was suspended from

the law school, and stated that she would no longer be able to attend class or take her final

exams.  Brauch gave Plainitff one week to contact Woods, or face dismissal from the law school.

On December 4, 2001, Plaintiff met with Woods and Ash.  At this meeting, Plaintiff

admitted that she wrote the evaluations.  As a result of the meeting, Brauch notified Plaintiff that

she would not be admitted back to the school until she had submitted to psychiatric evaluations,

which she would have to release to the law school.

Some time during the spring semester, Woods and Ash met with Plaintiff to suggest that she withdraw from school for medical reasons until she could receive psychiatric treatment and an assessment permitting her to return.  Plaintiff did not agree to withdraw, and her suspension continued.

On April 19, 2002, Plaintiff met with Brauch and Woods.  Brauch informed Plaintiff that she would be expelled from school if she did not withdraw.  Plaintiff agreed to withdraw, and she was allowed to take her examinations for her fall classes in May 2002.  Plaintiff believes her grades suffered as a result of the six-month delay in her examinations.

On November 26, 2004, Plaintiff filed this action for breach of contract, and requested $750,000 in compensation.  On January 13, 2005, Defendant filed the current motion to dismiss, or in the alternative for summary judgment.  This Court held a hearing on the matter on June 22, 2005.  This matter is now ripe for determination by the Court.

## II.  LEGAL STANDARDS

### A.  Failure to State a Claim

Federal Rule of Civil Procedure 12(b)(6) provides for the dismissal of actions that fail to state a claim upon which relief can be granted.  Although courts may only rely upon the complaint's allegations and those documents attached as exhibits or incorporated by reference, *Simons v. Montgomery County Police Officers*, 762 F.2d 30, 31 (4th Cir. 1985), courts will favorably construe the allegations of the complainant.  *Scheuer v. Rhodes*, 416 U.S. 232, 236 (1974).  Courts must assume that the facts alleged in the plaintiff's complaint are true.  *McNair v. Lend Lease Trucks, Inc.*, 95 F.3d 325, 327 (4th Cir. 1996).  A court will only grant a motion to

dismiss if "it appears to a certainty that the plaintiff would be entitled to no relief under any state of facts which could be proved in support of his claim." *Adams v. Bain*, 697 F.2d 1213, 1216 (4th Cir. 1982) (quoting *Johnson v. Mueller*, 415 F.2d 354, 355 (4th Cir.1969)). A plaintiff's misconception or mislabeling of the proper legal theory of the claim is not grounds for dismissal; a court must look to any legal theory supported by the facts alleged, so long as the plaintiff's complaint gives fair notice of the claim and the grounds upon which it rests. *Williams v. New Castle County*, 970 F.2d 1260, 1265-66 (3d Cir. 1992); *Thomas W. Garland, Inc. v. City of St. Louis*, 596 F.2d 784, 787 (8th Cir. 1979); *Sessions v. Chrysler Corp.*, 517 F.2d 759, 760-61 (9th Cir. 1975); *Dostchay v. Nat'l Mut. Ins. Co.*, 246 F.2d 221, 223 (5th Cir. 1957); *Simmons v. Cmty. Serv. Providers, Inc.*, 847 F.Supp. 351, 352-53 (E.D. Pa. 1994).

If matters outside the pleading are presented by the moving party and not excluded by the Court, "the motion shall be treated as one for summary judgment and disposed of as provided in Rule 56." FED. R. CIV. P. 12(b). If a motion to dismiss is converted to a motion for summary judgment, the Court must give all parties "a reasonable opportunity to present all material made pertinent by such a motion." FED. R. CIV. P. 12(b). The moving party's attachment of additional materials to the motion to dismiss does not automatically convert the motion to one for summary judgment; the Court must accept and consider those additional materials before a conversion is required. *Wilson-Cook Medical, Inc. v. Wilson*, 942 F.2d 247, 252 (4th Cir. 1991). However, the Court may consider any document attached to the motion to dismiss by a defendant when "a plaintiff fails to introduce a pertinent document as part of his complaint" and the document is "one of unquestioned authenticity." *Gasner v. County of Dinwiddie*, 162 F.R.D. 280, 282 (E.D. Va. 1995), *aff'd on other grounds*, 103 F.3d 351 (4th Cir. 1996); *accord Darcangelo v. Verizon*

4

*Communications, Inc.*, 292 F.3d 181, 195 n.5 (4th Cir. 2002)(noting that when a plaintiff relies upon an agreement in his complaint, the court may consider the agreement in ruling on a motion to dismiss); *New Beckley Mining Corp. v. Int'l Union, United Mine Workers of Am.*, 18 F.3d 1161, 1164 (4th Cir. 1994); *Parrino v. FHP, Inc.* 146 F.3d 699, 705-06 (9th Cir. 1998)("A district court ruling on a motion to dismiss may consider documents 'whose contents are alleged in a complaint and whose authenticity no party questions, but which are not physically attached to the [plaintiff's] pleading.'")(quoting *Branch v. Tunnell*, 14 F.3d 449, 454 (9th Cir. 1994)).

In this case, the Court finds that it can decide this matter without accepting and considering any documents attached by Defendants that are not pertinent to Plaintiff's Complaint and of unquestioned authenticity. Therefore, the Court will not convert this motion to dismiss to a motion for summary judgment.

### III.  DISCUSSION

**A.  Contractual Relationship**

Plaintiff contends that Defendant's Manual and Handbook should be considered a contract between her and the school. Therefore, Plaintiff argues that Defendant's investigation and identification of Plaintiff as the author of the student evaluations is a breach of contract. Defendant states that it is willing to concede for the purposes of this motion that these items do create a contractual relationship between Plaintiff and Defendant. Nevertheless, the Court should at least address the issue in passing.

Virginia law does not address whether a student handbook is a contract between a student and a university. However, a number of courts have held that "[t]he relationship between a university and a student is contractual in nature" and may be governed by a student handbook.

*Corso v. Creighton Univ.*, 731 F.2d 529, 531 (8th Cir. 1984); *accord Doherty v. S. Coll. of Optometry*, 862 F.2d 570, 577 (6th Cir. 1988); *Lyons v. Salve Regina Coll.*, 565 F.2d 200, 202 (1st Cir. 1977); *Mahavongsanan v. Hall*, 529 F.2d 448, 450 (5th Cir. 1976); *Slaughter v. Brigham Young Univ.*, 514 F.2d 622, 626 (10th Cir. 1975).

Defendant's policy manual provides that student evaluations of courses may be completed "anonymously." Plaintiff contends that Defendant breached its duty to protect her anonymity when Defendant sought to discover the author of her evaluations, and then after Defendant identified her as the author, took disciplinary action against her. This is the basis of Plaintiff's breach of contract action.

## B.  Deference to Administration of Institutions of Higher Education

First, Defendant contends that the Court should defer to the administration's judgment in this case, because the school had to act to either protect the student or to properly deal with a student making troubling accusations. "In the absence of a constitutional or statutory deprivation, the federal courts should be loathe to interfere with the organization and operation of an institution of higher learning." *Tigrett v. Rector & Visitors of the Univ. Of Va.*, 290 F.3d 620, 629-30 (4th Cir. 2002). Much of the case law in this area focuses on appeals of administrative decision-making, in that a student is typically appealing the decision of a university to suspend or expel a student based upon academic or disciplinary criteria. *See*, *e.g.*, *Regents of Univ. of Michigan v. Ewing*, 474 U.S. 214 (1985). However, this is not such a case. Plaintiff is not directly appealing Defendant's decision to expel her, but arguing that the contractual language prohibited the school from identifying her for expulsion in the first place.

Additionally, the United States Court of Appeals for the Fourth Circuit ("Fourth Circuit")

has pointed out that this deference primarily exists in cases of public institutions or violations by private institutions of the civil rights act. *Krotkoff v. Goucher Coll.*, 585 F.2d 675, 681-82 (4th Cir. 1978). The cases Defendant cites in support of its argument support this understanding of the law. *See e.g.*, *Quarterman v. Byrd*, 453 F.2d 54, 56 (4th Cir. 1971)(quoting *Epperson v. Arkansas*, 393 U.S. 97, 104 (1968))(noting that courts tend to avoid intervening in the daily operations of public schools unless there is a constitutional right at issue); *Hubbard v. John Tyler Cmty. Coll.*, 455 F.Supp. 753, 756 (E.D. Va. 1978)(finding that courts refrain from re-evaluating grades assigned by a teacher in a state institution). In cases involving a contract and a private university, the Court should apply the standard principles of review, and not afford special deference to the university's interpretation of the contract. *See Krotkoff*, 585 F.2d at 682; *see also McConnell v. Howard Univ.*, 818 F.2d 58, 69-70 (D.C. Cir. 1987).

**C. Reasonable Expectations of Contract**

Although many courts have found the student-university relationship to be contractual in nature, a number of those courts have favored a flexible application of contract law rather than full application of all contract principles to the relationship. These courts apply "the standard of 'reasonable expectation – what meaning the party making the manifestation, the university, should reasonably expect the other party to give it.'" *Cloud v. Trustees of Boston Univ.*, 720 F.2d 721, 724 (1st Cir. 1983)(quoting *Lyons v. Salve Regina Coll.*, 565 F.2d 200, 201 (1st Cir. 1977), *cert. denied*, 435 U.S. 971 (1978)); *see also*, *Doherty v. S. Coll. of Optometry*, 862 F.2d 570, 577 (6th Cir. 1988), *cert. denied*, 493 U.S. 810 (1989); *Slaughter v. Brigham Young Univ.*, 514 F.2d 622, 626-27 (10th Cir. 1975), *cert. denied*, 423 U.S. 898 (1975); *Giles v. Howard Univ.*, 428 F.Supp. 603, 605 (D. D.C. 1977). The parties concurred at the hearing that this

standard should apply to the contractual issues in this case.  The reasonable expectation standard

is generally a question of fact.  Therefore, in order for the Court to find for Defendant on its

motion to dismiss, the Court must find that it appears to a certainty that no reasonable university

would have expected a student to believe that the anonymity provision in the Manual would

protect the student's identity in a situation like the one before the Court.  For reasons the Court

will now set forth, the Court cannot so find.

## 1.  Plain Meaning of Anonymous

Initially, the Court finds it helpful to examine the plain meaning of the contractual

language.[1]  Defendant argues that Plaintiff confuses an expectation of anonymity with an

expectation of confidentiality.  The United States Supreme Court ("Supreme Court") has noted

that "[c]onfidentiality differs from anonymity."  *Ohio v. Akron Ctr. for Reprod. Health*, 497 U.S.

502, 513 (1990).  However, in the context of the facial validity of the abortion parental consent

statute at issue in that case, the Supreme Court did not find the difference to be "constitutionally

significant."  *Id*.  This does not address whether the difference might be *contractually* significant.

This Court finds that the difference is contractually significant, as is made clear by their legal

---

[1]  Generally, the intent of the parties must first be determined as expressed in the language
of the contract.  *Foothill Capital Corp. v. East Coast Bldg. Supply Corp.*, 259 B.R. 840, 844
(E.D. Va. 2001)(citing *Bender-Miller Co. v. Thornwood Farms, Inc.*, 211 Va. 585, 588 (Va.
1971)).  Where the intent of the parties is clear, and the contractual language can only reasonably
be interpreted one way, courts should construe the language of the contract in accordance with its
plain and ordinary meaning.  *Foothill Capital Corp.*, 259 B.R. at 844 (citing *Appalachian Power
Co. v. Greater Lynchburg Transit Co.*, 236 Va. 292, 295 (Va. 1988)).  This is commonly referred
to as the "plain meaning" rule, which "stipulates that 'where an agreement is complete on its
face, is plain and unambiguous in its terms, the court is not at liberty to search for its meaning
beyond the instrument itself.'"  *Foothill Capital Corp.*, 259 B.R. at 845 (quoting *Berry v. Klinger*,
225 Va. 201, 208 (Va. 1983)).  When the plain meaning rule is applied, the interpretation of the
contract is a matter of law, not a question of fact.  *Musgrave v. HCA Mideast, Ltd.*, 856 F.2d 690,
694 (4th Cir. 1988).

definitions.

"Anonymous" is defined as "[n]ot named or identified."  Black's Law Dictionary (8th Ed. 2004).  "Confidential" is defined as "meant to be kept secret."  *Id*.  Defendant urges the Court to adopt a reading of "anonymous" that would only guarantee students the right to submit the evaluations without the students' names on the forms.  It appears to be Defendant – not Plaintiff – that confuses the concepts of confidentiality and anonymity.  If the student evaluations were meant to be confidential, that would allow certain agreed upon parties (such as the administration) to know the identity of the evaluating student, but would require the administration to withhold the identity of the student from others.  This scenario sounds very much like what Defendant would like the Court to find was the case.  On the contrary, anonymity implies that the student evaluation would be completed without any means of identifying the author.  Accordingly, the Court cannot find that Defendant's interpretation of the clause meets the plain and ordinary meaning of "anonymous."

However, the plain meaning rule does not apply squarely in this case because the Court finds and the parties agree that the "reasonable expectation" standard is applicable to the contract before the Court.  The Court must look to additional factors to determine the reasonable expectation standard.

*2.  Anonymity in Other Provisions of the Contract*

Next, the Court examines other guarantees of anonymity that Defendant provides in the contract with its students.  If multiple documents form the basis of the contractual relationship between the parties, and are entered into contemporaneously, then the court should construe the documents together.  *Foothill Capital Corp. v. East Coast Bldg. Supply Corp.*, 259 B.R. 840,

844-45 (E.D. Va. 2001)(quoting *In re 1550 Wilson Boulevard L.P.*, 206 B.R. 812, 817 (Bankr. E.D. Va. 1996)).  No word or provision in a contract should be rendered meaningless "when a reasonable interpretation exists that gives effect to and is consistent with all parts of the contract." *Foothill Capital Corp.*, 259 B.R. at 845 (citing *Wilson v. Holyfield*, 227 Va. 184, 187 (Va. 1984)).

To this end, Defendant points to the use of the word "anonymous" in the grading policy, as set forth in the Policies and Procedures Manual.  The Manual states that "[t]he law school, as a general rule, uses anonymous grading."  Regent Univ. Law Sch. Policies & Procedures Manual at 38 (2001).  Defendant argues that if the term anonymous meant what Plaintiff argues – that her identity had to be protected at all times – then the university could never breach her anonymity so as to attribute her grades to her.  Defendant asserts that this policy indicates that the use of "anonymous" in the Manual only refers to anonymity from the professors for purposes of protecting the fairness of the grading process, not a permanent shield for Plaintiff.

The problem for Defendant is that this does not squarely address the question now before the Court.  Addressing the issue under the reasonable expectations standard, the question is not whether the anonymity guaranteed to Plaintiff is absolute, but rather, given the facts currently before the Court, to what extent Defendant reasonably should have expected Plaintiff to believe her identity would remain anonymous.  In other words, a university may reasonably expect a student to believe that an anonymous grading policy would require the university to associate the student with the grade at some point in the process.  However, this expectation does not dictate that such an association would be expected between a student and her course evaluations.

Plaintiff cites to *EEOC v. Univ. of Notre Dame du Lac*, 715 F.2d 331 (7th Cir. 1983), for

10

the principle that in any kind of review or evaluation process, the identity of the author of the evaluation should be protected.  *Notre Dame du Lac* involved a situation where the Equal Employment Opportunity Commission ("EEOC") sought to obtain unredacted copies of a professor's peer reviews.  The university sought to remove the names of the evaluators from the reviews.  The Court of Appeals for the Seventh Circuit ("Seventh Circuit") held that the promise of the university to maintain the confidentiality of the peer review process was essential to the integrity of the process.  The Seventh Circuit ordered the files redacted.  This case is not on point with the current issue before the Court.

First, as discussed above, there is a significant difference between confidentiality and anonymity.  Neither party disputes that this is a case where Plaintiff was promised some form of anonymity, not confidentiality.  In fact, if Plaintiff had been promised only confidentiality, then it would be clear that the contract had not been violated, for the school did keep her identity in relation to the evaluations confidential.  Second, the party seeking to obtain the records – the EEOC – was outside of the university administration.  Despite this, the university was prepared to turn over the records to the EEOC for the purposes of its investigation *if* the EEOC agreed to abide by the confidentiality agreement.  The EEOC had refused to do so.  In the current matter, Defendant was an intended recipient of the evaluations, and Defendant did not turn the records over to an outside investigative agency.  The Court finds *Notre Dame du Lac* unavailing to Plaintiff.

3.  *Conflict with Other Provisions of the Contract*

Defendant reiterates that the Policies and Procedures Manual must be read in conjunction with the University Student Handbook.  As noted above, if multiple documents form the basis of

11

the contractual relationship between the parties, and are entered into contemporaneously, then the

court should construe the documents together. *Foothill Capital Corp.*, 259 B.R. at 844-45

(quoting *In re 1550 Wilson Boulevard L.P.*, 206 B.R. 812, 817 (Bankr. E.D. Va. 1996)).  No

word or provision in a contract should be rendered meaningless "when a reasonable

interpretation exists that gives effect to and is consistent with all parts of the contract." *Foothill

Capital Corp.*, 259 B.R. at 845 (citing *Wilson v. Holyfield*, 227 Va. 184, 187 (Va. 1984)).

     In the factual background, the Court noted that the Manual states the following:

> At the end of every academic semester, each student will be given the
> opportunity to give his or her evaluation of a course.  Students are asked to
> evaluate (and may do so anonymously) the appropriateness of the reading
> materials assigned, the adequacy of the class coverage in light of the syllabus, the
> teacher's knowledge of the subject matter, the teacher's ability to communicate
> that knowledge effectively, and the spiritual content of the course.
>     Student evaluations are reviewed by the instructors only after course grades
> have been assigned.  Student evaluations are also reviewed by the Dean.

Regent Univ. Law Sch. Policies & Procedures Manual at 41 (2001).  Defendant points out that

the Student Handbook provides:

> We do not discriminate on the basis of race, color, national or ethnic origin in
> administration of educational policies . . . and other university administered
> programs. . . .
> **Standard of Personal Conduct**
> Regent University encourages a close and edifying relationship between faculty
> and students, one that will deepen the spiritual growth of each and stimulate a
> vigorous intellectual life in the Regent community.  In order to accomplish these
> aims, it is imperative that Regent University faculty, staff and students conduct
> themselves in a Christlike and professional manner and maintain an exemplary
> and involved lifestyle including regular church attendance, participation in
> activities of the Regent community and its founding organization. . . .
> **Freedom of Expression**
> . . . Exercising academic freedom requires a responsibility to truth and scholarly
> integrity as well as complete honesty and loyalty to the Mission Statement, the
> Standard of Personal Conduct and the Student Honor Code. . . .

**The Honor Code**
Regent University students are expected to read and adhere to the honor code as provided below.
Under this code, it is assumed and expected that a student conducts himself or herself in accordance with the Standard of Personal Conduct and lives his or her life accountable to God, first of all, and then to fellow students.  In this way, an atmosphere of trust and respect is created that glorifies God and assures openness in the community. . . .
**Student Discipline Procedures**
Enrolled students are expected to conduct themselves in a manner consistent with the Honor Code and the Standard of Personal Conduct.  Students shall be disciplined for actions that violate these policies which include, but are not limited to, academic dishonesty, theft or misuse of property, threats to the health and safety of others, abuse or intimidation, sexual misconduct, violation of housing rules of regulations, or conduct deemed unlawful. . . .
**Sexual Harassment Policy**
It is Regent University's policy to provide students and employees with an environment for learning and working which is free of sexual harassment whether by members of the same sex or opposite sex.

Regent University Student Handbook at 1,26-29, & 48 (1998).

First, Defendant contends that it was obligated to investigate the charges under the

Handbook's sexual harassment policy.  Therefore, Defendant argues, Plaintiff had no reason to

believe that her identity would not be discovered in the course of that investigation, and

Defendant was obligated to discover who she was in order to protect her and validate the charges.

Plaintiff responds that the investigation could have been handled without ever identifying the

student.  In fact, Defendant did interview many members of the classes before approaching

Plaintiff, and had already come to the conclusion that the allegations were false.  There was no

reason for Defendant to further investigate the identity of the author if Defendant's only goal was

to make sure its sexual harassment policy was not being violated by the professors.

Second, Defendant argues that these excerpts from the Handbook show that the student is

contractually bound to act in a trustworthy, honest, professional, and Christian manner, and

refrain from acts of abuse and intimidation.  Defendant contends that Plaintiff's false allegations were not in accordance with these contractual provisions.  Essentially, Defendant argues that Plaintiff breached the contract, and in order to penalize her properly under the penalty provisions of the contract, it was necessary for Defendant to discover Plaintiff's identity.  Defendant's argument appears to be that it would render the enforcement provisions of the handbook meaningless if Defendant was unable to discover Plaintiff's identity when she violated the honor code and code of conduct in writing the evaluations.

The Court sympathizes with the Defendant's position, and concedes in this case the Plaintiff's comments were delusional, malicious, false, and offensive.  However, there is a greater issue at stake here.  In its motion to dismiss, Defendant is essentially asking the Court to hold as a matter of law that a reasonable university should expect students to believe that anytime the administration determines that a university policy has been violated, the administration has the right to breach the anonymity provision.  This understanding of the contractual language would place the guarantee of anonymity to the student within the unfettered discretion of the university, and therefore provide no real protection to the student.  The Court cannot find as a matter of law that this is the reasonable interpretation of what a guarantee of anonymity means to a student completing a course evaluation form.

*4. Anonymous Course Evaluations*

Independent of any duty Defendant had to enforce university policy, Defendant argues that no reasonable person could believe that her anonymity would be protected no matter how egregious her comments were.  In other words, Defendant would have the Court apply the "reasonable expectation" rule to this contract and find at law that Defendant reasonably should

14

not have expected a student to think that a guarantee of anonymity would protect the student from making outrageous allegations on a student evaluation.

Defendant contends that if Plaintiff had indicated that she was going to commit suicide or murder, surely the school would have been obligated to attempt to identify the student. Defendant reasons that this shows that the anonymity provision had exceptions for reasonable purposes, and that the kind of allegations made by Plaintiff fit in that category.  Plaintiff responds that this is a slippery slope argument – that these allegations do not call for the same type of response as would a student's statement that he or she was contemplating a violent act.[2]

The Court is not confronted with what Defendant's obligations might or might not be in the case of a student whose evaluations expressed the intent to engage in criminal conduct or threatened his or her personal health.  Rather, in this case, Defendant determined that Plaintiff had acted in an inappropriate manner by submitting delusional, malicious, false, and offensive evaluations.  On that basis, Defendant sought to identify Plaintiff.

As the Court noted above, it is understandable why Defendant responded as it did to Plaintiff's allegations.  But whether it would be good policy for Defendant to act upon such allegations is not the question the Court has to resolve.  The question is whether Defendant bound itself to not do so in its contract with students.

Virginia law requires that a contract be more strictly construed against the party who drafted it.  *Winn v. Aleda Constr. Co., Inc.*, 227 Va. 304, 307 (Va. 1984).  Defendant developed

---

[2] Plaintiff also uses this opportunity to argue that the punishment imposed on her was not appropriate.  However, the Court notes that this question is not before it.  The only issue complained of is that Defendant breached the contract by identifying Plaintiff.  No claim has been raised in regards to the appropriateness of the punishment, and the Court will not entertain any argument on the subject.

and published the Manual and Handbook.  Plaintiff was clearly in an inferior position to negotiate any terms of the rules which governed her time at the university.  If the administration wanted to be able to police the content of the evaluations, it had every opportunity to include such a provision within the handbook, the manual, or on the course evaluations, themselves.  It did not do so.

The problem with Defendant's position in its motion to dismiss is that Defendant would have the Court find that as a matter of law that the contract as written gives the administration broad powers to investigate the identity of students whenever an evaluation reaches some ambiguous point at which it is egregious enough to justify such an investigation.  This standard would provide no practical guidance to a student who chooses to fill out this completely discretionary evaluation as to when the anonymity guaranteed by the university policy could be pierced.  The Court cannot find that it appears to a certainty that reasonable universities would expect students to fill out "anonymous" evaluations with the understanding that "anonymous" meant "only anonymous until the administration decides that you have not acted in a 'Christlike' or 'professional' manner, or that a comment you make about a professor is 'abusive' or 'intimidating.'"  Clearly, the question of how reasonable universities would expect students to interpret such an anonymity clause is still disputable as a question of fact.  As such, dismissal of this matter is not appropriate at this stage.

**D.  Scope of the Contract**

Defendant contends that even if Plaintiff was entitled to remain anonymous, the responses by Plaintiff were outside the scope of the evaluation.  One of the areas that students are asked to comment upon is "the teacher's ability to communicate that knowledge effectively."  Certainly

the racist or sexist attitudes or statements of the instructor would interfere with the instructor's

ability to convey information to the class.  Even when read in conjunction with the other

procedures Defendant has in place for reporting sexual harassment and racial discrimination, the

Court cannot find that allegations of sexist and racist behavior would be outside the scope of the

feedback requested on the evaluation forms, even if these forms are not Defendant's preferred

method of learning about such allegations.

**E.  No Investigation**

Defendant finally argues that even if the Court found that Plaintiff was entitled to

anonymity under the contract, there was no breach of contract because Defendant did not actively

seek to uncover Plaintiff's identity.  Rather, Plaintiff's identity was revealed to the administration

by one of the law school's secretaries, Carol Palatini, who, while collecting the evaluations,

allegedly heard from some students that Plaintiff had written these evaluations.  Thus,

Defendant's theory is that because it made no affirmative efforts to investigate Plaintiff's

identity, it is not a breach of contract that it came to know who wrote the comments and then

acted upon that information.

First, the Court notes that regardless of how the administration first came by its

suspicions of Plaintiff's identity, clearly the administration sought to confirm that she was the

author of the evaluations in its meetings with her.

Second, the Court can imagine a situation where a student walks up to one of the

professors after an exam and tells the professor, "By the way, the exam code of that student who

has annoyed you all semester is XYZ."  Surely Defendant would not consider it acceptable if the

professor then assigned that student a poor grade on the theory that the professor just happened to

17

come by the identity of the student through no fault of the professor's own.  If Defendant was

obligated to protect the anonymity of Plaintiff's identity, it would not be reasonable to find that

an accidental discovery of Plaintiff's identity was an acceptable means of circumventing that

obligation.  Defendant's argument is without merit.

### IV. CONCLUSION

For the foregoing reasons, Defendant's Motion to Dismiss is **DENIED**.

The Court **DIRECTS** the parties to appear before a United States Magistrate Judge to

seek to resolve this matter within ten (10) days of the date of this order.

The Court **DIRECTS** the Clerk to send a copy of this Order to the parties.

**IT IS SO ORDERED.**


_____/s/_____
RAYMOND A. JACKSON
UNITED STATES DISTRICT JUDGE

Norfolk, Virginia
August 5 , 2005

18